GRIMES v. EDDY *et al., Receivers, Appellants.*

### In Banc, December 22, 1894.

1. **Railroad**: NEGLIGENCE: TEXAS CATTLE FEVER. A railway company which negligently permits Texas cattle to escape from its cars and run at large, thereby causing native cattle to contract Texas fever, is liable to a common law action for the resulting loss.

2. ———: ———: ———: JUDICIAL NOTICE. Courts will take judicial notice of the fact that Texas cattle have some contagious or infectious disease communicable to native cattle.

3. **Constitution**: STATUTE. A statute may be constitutional in part, and in part unconstitutional; it may be entirely valid as to some classes of cases and clearly void as to others.

4. ———: ———: TEXAS CATTLE: INTERSTATE COMMERCE. Revised Statutes, 1889, section 953, in so far as it forbids the transportation, through this state, of Texas or other cattle therein designated, affected with Texas fever, is void as an interference with the interstate commerce.

5. ———: ———: ———. This state may, however, prevent the importation of such diseased cattle into its territory, and it may prescribe the kind of cars in which they may be transported through the state, and such other precautionary measures as may be reasonably necessary.

*Appeal from Monroe Circuit Court.*—HON. T. H. BACON, Judge.

AFFIRMED AS TO FIRST COUNT.

REVERSED AS TO SECOND COUNT.

*Jackson & Montgomery* for appellants.

(1) The court erred in not sustaining the defendant's demurrer under the first count in the petition, because the evidence wholly failed to sustain the averments of the petition in these three particulars: *First.* That the cattle transported and alleged to have been permitted to escape, etc., were infected with a deadly disease. *Second.* That the defendants knew the fact. *Railroad v. Finley,* 16 Pac. Rep. (Kan.) 956; Shearman and Redf. on Neg. [3 Ed.] sec. 193; *Patee v. Adams,* 14 Pac. Rep. (Kan.) 505; *Hawks v. Lock,* 139 Mass. 205; *Coyle v. Conway,* 35 Mo. App. 495; *Bradford v. Floyd,* 80 Mo. 212. *Third.* That they negligently permitted the cattle to escape from their custody or control. (2) The court erred in admitting evidence as to universal knowledge of the fact that all Texas cattle were diseased, or communicate Texas fever to all native cattle. *State v. Hays,* 78 Mo. 318; 1 Greenleaf on Ev., sec. 6a; *State v. Barber,* 136 U. S. 459. (3) The court erred in refusing to give the instructions prayed by defendants and refused. See authorities cited *supra.* (4) The court erred in giving the instructions given of its own motion. See authorities cited *supra.* (5) Upon the second count the appellants contend the same errors were committed as those upon the first count, and to which attention has already been called. The act is unconstitutional, as being a regulation of commerce, and void. *State v. Barber,* 136 U. S. 457; *Leisy v.*

*Hardin*, 135 U. S. 119; *Cooley v. Port Wardens*, 12 How. 299; *Cardwell v. Bridge Co.*, 113 U. S. 205; *Wilton v. Missouri*, 91 U. S. 275; *Hall v. DeCuir*, 95 U. S. 485; *Sinnot v. Davenport*, 22 How. 227; *Foster v. Davenport*, 22 How. 244; *The License cases*, 5 How. 504; *Brimmer v. Rebman*, 138 U. S. 863; *Wilkerson v. Rahrer*, 11 Sup. Ct. Rep. 867; *Mail S. Co. v. Pennsylvania*, 122 U. S. 1204; *Henderson v. Wickham*, 92 U. S. 549; *Stanley v. Railroad*, 100 Mo. 438; *Connell v. Tel. Co.*, 108 Mo. 463.

*R. N. Bodine* and *Stocking & Alexander* for respondent.

(1)   Anyone who allows diseased or infected animals to run at large, knowing them to be diseased or infected, is liable for the damage or loss which such animals may cause by reason of such disease or infection. *Bradford v. Floyd*, 80 Mo. 207; *Coyle v. Conway*, 35 Mo. App. 490; *Railroad v. Finley*, 38 Kan. 550; *Pattee v. Adams*, 37 Kan. 133; *Regina v. Huson*, 1 Dean. 24; *Mills v. Railroad*, 2 Rob. (N. Y.) 326; *Fisher v. Clark*, 41 Barb. (N. Y.) 329; *Walker v. Herron*, 22 Tex. 55; Cooley on Torts, p. 343; Addison on Torts, sec. 261; *Hill v. Applegate*, 40 Kan. 31.   (2) Much more, if defendants had in their care or control animals known to them to be affected with a contagious disease, and negligently allowed them to wander upon the streets of Paris, by reason of which plaintiff suffered damage, then defendants are liable therefor.   See authorities cited *supra*.   (3)   The question of negligence was submitted to the jury under proper instructions, and their finding upon this fact is conclusive, there being ample evidence to support it.   (4) Evidence of the general notoriety of the fact that all Texas cattle are affected or infected with what is called Texas fever, and will

impart the Texas fever to native cattle under certain conditions, is competent to show that defendants had knowledge of that fact. *Benoist v. Darby*, 12 Mo. 196, *Dickinson v. Chrisman*, 28 Mo. 134; *Conover v. Berdine*, 69 Mo. 125; *Gordon v. Ritenour*, 87 Mo. 54; *Brander v. Feraday*, 16 L. R. A. 296; *Lee v. Kilburn*, 3 Gray, 594; *Carpenter v. Leonard*, 3 Allen, 32. (5) The statute upon which the cause of action in the second count is based is constitutional. *Railroad v. Husen*, 95 U. S. 465; *Kimmish v. Ball*, 129 U. S. 217; *Minnesota v. Barber*, 136 U. S. 313; *Leisy v. Harding*, 135 U. S. 100; *Brown v. Railroad*, 125 U. S. 465; *Patterson v. Kentucky*, 97 U. S. 501; *Railroad v. Finley*, 38 Kan. 550; *Brown v. Maryland*, 12 Wheat. 445; *License cases*, 5 Howard, 589; *Gilman v. Philadelphia*, 70 U. S. 713. (6) At least that portion of said statute under which plaintiff claims, to wit, the clause against allowing diseased or distempered animals to run at large, is constitutional. *Kimmish v. Ball*, 120 U. S. 217; *Allen v. Louisiana*, 103 U. S. 80; *Railroad v. Keokuk*, 95 U. S. 80.

BURGESS, J.—This is an action to recover the value of a cow alleged to have died from Texas fever contracted from cattle shipped over the Missouri, Kansas & Texas Railway, while the same was being operated by the defendants as receivers. The suit was commenced before a justice of the peace in Monroe county, and appealed to the circuit court. The statement is in two counts, and, leaving off the caption, is as follows:

"Plaintiff says that the Missouri, Kansas & Texas Railway Company was, on and after the day hereinafter mentioned, and now is, a railroad corporation organized under the laws of the state of Kansas, and that at the time hereinafter mentioned, defendants,

Geo. A. Eddy and H. C. Cross, were, and now are, receivers of the said Missouri, Kansas & Texas Railway Company, appointed by the United States circuit court for the eighth judicial circuit, and as such receivers, were, at said date, and now are, in possession of the railroad of said corporation, known as the Missouri, Kansas & Texas railroad, running through the county of Monroe in the state of Missouri, and as said receivers, engaged in running and operating the same, and doing a general railroad business over and on said railroad.

"Plaintiff states that on or about the —— day of May, 1890, defendants, as such receivers, were engaged in transporting upon said railroad, and had upon their cars, while so transporting through Monroe county, Missouri, a large number of Texas cattle, said cattle being at said time infected with a deadly disease known as Texas fever; that all Texas cattle during the spring and summer months, whether perceptibly affected by said disease or not, communicate the same to all cattle raised in Missouri, passing over land previously passed over by such Texas cattle; that defendants at said time well knew that said cattle were Texas cattle, that they were infected with said disease and of the liability aforesaid to communicate said disease to Missouri raised cattle by leaving the germs of said disease upon the ground over which they traveled, and and that defendants as such receivers, so knowing, and while said Texas cattle were by them being transported across Monroe county, Missouri, wrongfully and negligently, by their servants and employees permitted said Texas cattle, so infected with said disease and so liable to communicate said disease as aforesaid, whether apparently affected themselves or not, to escape from the control and custody of said defendants and run at large over a large area of land in Monroe county, Missouri, including public highways, for a space of

twelve hours or more; and that plaintiff then and there being the owner of a certain Missouri raised cow of the value of $125, the same, without any fault or negligence of plaintiff, passed over the ground over which said Texas cattle had passed as aforesaid, and thereby the said disease of Texas fever was communicated to plaintiff's cow, whereby she sickened and died, so that she was wholly lost to plaintiff, whereby he was damaged in the sum of $125, for which he asks judgment.

"Plaintiff, for another cause of action against defendants, as receivers as aforesaid, states that the Missouri, Kansas & Texas Railway Company was, on and after the days hereinafter mentioned, and now is, a railroad corporation organized under the laws of the state of Kansas, and at the time hereinafter mentioned defendants were, and now are, the receivers of the said Missouri, Kansas & Texas Railway Company, appointed by the United States circuit court for the eighth judicial circuit, and, as such receivers, were, at said dates, and now are, in possession of the railroad of said corporation known as the Missouri, Kansas & Texas railroad, running through the county of Monroe in the state of Missouri, and as such receivers, engaged in running and operating the same and doing a general railroad business over and on said railroad. Plaintiff states that on or about the ———— day of May, 1890, defendants, as such receivers, were engaged in transporting upon said railroad, and had upon their cars while so transporting through Monroe county, Missouri, a large number of Texas cattle, at said time being affected with the disease known as Texas fever, that defendant at said time well knew that said cattle were Texas cattle, and were affected with Texas fever; that said cattle, while being so transported by defendants, were permitted by defendants to escape from the cars in said Monroe county, and to run at large over a

large area of land in said county along the route and in the vicinity of said railroad, including public highways, for the space of twelve hours or more, and that plaintiff then and there being the owner of a certain native Missouri raised cow of the value of $125, the same, without any fault or negligence of the part of the plaintiff, passed over the ground over which said Texas cattle had passed as aforesaid, and thereby the said disease of Texas fever was communicated to plaintiff's said cow, whereby she sickened and died, so that she was wholly lost to plaintiff, whereby he was damaged in the sum of $125, wherefore plaintiff says that under the provisions of sections 953 and 954 of the Revised Statutes of Missouri, 1889, he is entitled to recover from defendants the sum of $125, for which he asks judgment."

To the statement defendants filed an answer denying all the allegations contained therein. A separate trial was had on each count, resulting in a verdict and judgment for plaintiff on both counts.

It was by stipulation admitted that the cattle, which it is claimed caused the injury, were shipped from Sinton, in San Patricio county, Texas, over a line of railroad connecting with that operated by the defendants at West Point, Texas, and then delivered to the defendants, consigned to Chicago, Illinois. Said cattle were shipped May 16, 1890, and reached Paris, Monroe county, on the morning of May 21, 1890, while en route to Chicago. As the cars going eastward toward the depot passed over the switch, they were wrecked. The engine and several cars loaded with coal went over the switch safely, but the rear trucks of one coal car and the cars in which these cattle were loaded, were thrown from the track and the balance of the train remained standing on the track in a westerly direction from the wreck. One of the

cattle cars was broken in at one end, and some of the cattle escaped in this way. The cars were thrown over to one side, and the cattle all thrown together at one end, and it became necessary to remove them speedily to prevent them smothering. This was done by opening the side doors, pulling them out with ropes, etc.

The town of Paris lies nearly wholly south of the railway and there is no street across the railway track west of where the wreck occurred. The depot and stock yard are east of the place of the wreck; the stock yard on the north side of the track. At the place of the wreck the right of way on the north side abuts upon enclosed land, and just east of the wreck and opposite where the forward part of the train stood is located a section house and tool house. The right of way opposite the wreck was also enclosed ground. The wrecked cars were thrown toward the south, a coal car striking a telegraph pole, and bearing it down upon the wire fence close to where it stood. The train in the rear of the wreck stood on the track reaching back the length of some fifteen or sixteen cars to a trestle or fill. So that, between the wreck and the fill, there was no way to pass from the south side of the track to the north side, because of the cars in the train standing on the main track. A short distance west of the wreck, and south of the railway, is a little open piece of ground through which a road runs from its connection with the regularly laid out streets of the town to a road crossing the railway, through a gate into private grounds lying north of the track. The cars of the train not wrecked stood across this crossing. As the cattle escaped from or were removed from the wrecked cars, they were scattered along the right of way south of the track and between the wreck

and the road crossing west of the wreck about one hundred and fifty feet.

Plaintiff's evidence showed no efforts of anyone, save the trainmen and railroad employees, to stop the cattle from wandering off. They did nothing with the cattle that night as they were wild, vicious and unmanageable. By daylight the next morning the cattle had wandered out over the streets of Paris, and upon open grounds, some going as far as a mile in the country, and it was 10 o'clock A. M. before they were all driven into the railroad stock pens by horsemen.

The testimony showed that all Texas cattle contain in their system a parasite or germ which is harmless to them; that it simply acts upon their system as vaccine does upon a human being, inoculating them and rendering them free from all danger from the disease; that they are not diseased themselves, but, on the contrary, are inoculated against the disease, and do not die from it, unless they are brought to a colder climate, and get rid of the parasite and are then again subject to the disease, in which event it is as fatal to them as it is to native cattle. There was no indication of any disease in the Texas cattle that escaped at Paris. The evidence also showed that native cattle walking over the same ground where the Texas cattle had been, or eating from the same hay, or drinking from the same pool of water, would contract the Texas fever, and that over twenty head belonging to different persons in Paris and which had thus been exposed to the disease, did, in a few days thereafter, contract and die from the Texas fever, and among the rest, the cow of plaintiff.

The evidence on the part of the defendants showed that, at the time of the wreck, the train was running at the rate of eight to ten miles per hour; that the engine and three or four cars passed over the switch safely, but that the rear trucks of a coal car went on the

switch track, and the forward trucks on the main line, and the wreck resulted. An examination of the switch revealed the fact that the rod connecting the switch with the target and shaft had been detached. The pin which held the goose neck with which the connection had been made, had been removed and carried or thrown away, and the connection made by the goose neck broken. The result was that the moving cais passing over the track at the switch misplaced or opened the switch, and the forward trucks, passing over in safety, remained on the main track, but the rear trucks of the same car were, by reason of the moving of the switch, sent on the switch track. The stone used in separating the connection was found, and the marks on it and the iron connection were plainly seen. Similar wrecks and attempts at wrecks had been made on the line of defendants' railway during the same season, and in the same location. As soon as they could do so, defendants had the cattle collected and placed in the stock pens of the railroad company.

At the close of plaintiff's evidence, defendants interposed a demurrer thereto, which was overruled. Under the instructions of the court there was a verdict for plaintiff on each count in the complaint. Defendant's then filed a motion for new trial and in arrest of the judgment, which being overruled, they appealed to this court.

The first contention of defendants is that the demurrer to the evidence under the first count in the statement should have been sustained for the reason that it failed to support the averments in the statement in that it failed to show that the Texas cattle which were permitted to escape, were infected with a dangerous or deadly disease, and that the defendants knew it, and

that they negligently permitted the cattle to escape from their custody or control.

The cause of action stated in the count now under consideration being one at common law, before plaintiff was entitled to recovery thereunder, it devolved upon him to show, not only that the Texas cattle were infected with a dangerous and deadly disease, microbe or parasite, and that the disease was communicated to his cow, by reason of which she died; but it devolved upon him to show that defendants knew, or that it was a notorious fact, that all Texas cattle were so diseased or so infected, and that it was by their negligence, or that of their employees, that they were permitted to escape from their custody or control.   While the proof did not show that the cattle were themselves, in fact, diseased, it is of general notoriety that all cattle in that part of Texas from which these cattle were shipped are infected with a microbe or germ of disease which is taken in by Missouri cattle by injection, that is, taken into the system through the stomach by eating grass over which Texas cattle have traveled, or by drinking water from pools or streams through which they have passed and deposited the germ by dropping, or from ticks.

Plaintiff undertook to fix notice on defendants of the infection of the cattle by proof of notoriety of the fact that all Texas cattle are affected with what is called Texas fever, and will impart that fever to native cattle under certain conditions.

In respect of animals of a wild nature, such as beasts of prey, or animals by nature vicious, the owner is responsible for any damages occasioned by them, whether or not he knew of their habits or disease. *Canefox v. Crenshaw*, 24 Mo. 199.

While at common law it was the duty of every man to restrain his cattle within his own inclosure and

for failing to do so he was liable for their trespasses and for injuries resulting from disease communicated by them, whether he voluntarily permitted them to go at large or not (Cooley on Torts [2 Ed.], 397), as to domestic animals, the common law does not fix any liability on the owner for damages done by them when at large on the ground of negligence, unless it be proven that the owner knew that the animals were mischievous or dangerous.  *Lyke v. Van Leuven*, 4 Denio, 127; Cooley on Torts [2 Ed.], *341, *343; *Dearth v. Baker*, 22 Wis. 73; *Vrooman v. Lawyer*, 13 Johns. 339; *Railroad v. Finley*, 38 Kan. 550; *Patee v. Adams*, 37 Kan. 133.

In *Bradford v. Floyd*, 80 Mo. 207, which was an action for damages occasioned to plaintiff's cattle by contact with what were known as Texas cattle, it was held that, while the evidence showed that the defendant knew that they were Texas cattle, before defendant could be held liable for damages caused by disease communicated by them to plaintiff's cattle, it must be shown that defendant knew that his cattle were diseased.   The same rule was announced in *Railroad v. Finley*, 38 Kan. 550, and *Patee v. Adams*, 37 Kan. 133.

Since those cases were decided, scientific investigation has demonstrated, and it is now a matter of general information or knowledge, that Texas cattle are not, in fact, diseased themselves, so as to render them unhealthy for food, but that all Texas cattle are infected in their systems with a parasite or germ, which is harmless to them, but which when taken into the stomach by native cattle produces what is known as Texas fever.   In *Kimmish v. Ball*, 129 U. S. 217, it was said: "That cattle coming from those sections of the country during the spring and summer months are often infected with a contagious and dangerous fever, is a notorious fact."

If, then, it be a notorious fact, courts will take judicial notice thereof, and no proof is required. So it is said that: "Courts will generally take notice of whatever ought to be generally known within the limits of their jurisdiction." Greenleaf on Evidence [14 Ed.], sec. 6. "If a fact, alleged to exist, and upon which the rights of parties depend, is within common experience and knowledge, it is one of which courts will take judicial notice." *Minnesota v. Barber*, 136 U. S. 313; *Brown v. Piper*, 91 U. S. 37–42; *Phillips v. Detroit*, 111 U. S. 604, 606.

Whatever difference of opinion may have at one time existed as to the cause and character of what is known as Texas fever, and the manner in which it is communicated to native cattle of the state, yet the fact is of common knowledge that the disease is imparted under certain conditions by Texas cattle. This peculiar characteristic, and its notoriety, is recognized by this and many other states, as is shown by the various legislation with respect thereto as well as by regulations in the markets of the country which require this class of cattle to be kept separate from others.

From these considerations it would seem that the case of *Bradford v. Floyd, supra,* in so far as it holds that courts will not take judicial notice of the fact that Texas cattle have some contagious or infectious disease communicative to native cattle should be overruled.

Plaintiff was permitted to prove, over the objections of defendants, that it was a matter of universal knowledge that Texas cattle were infected with an infectious disease communicable to native cattle, and while, from what has been said, such proof was entirely unnecessary, it is impossible to see how defendants could have been prejudiced thereby.

As the railway company owed no duty to the plaintiff, what produced or caused the wrecking of the train

was of no consequence, except for the purpose of show-
ing how the cattle escaped from the custody of defend-
ants or their employees, the inquiry being, whether the
escape was because of their carelessness or negligence.
If so, as it was a notorious fact that the cattle were
infected with microbes or parasites which were liable to
communicate, to domestic cattle traveling over the
ground after them, or eating grass over which they had
passed or their droppings had fallen, the Texas fever,
and the plaintiff's cow had contracted the disease in
that way, from which she died, the plaintiff is entitled
to recover.

As to whether or not the cattle were permitted to
escape from the custody of defendants' employees after
the wreck, by reason of their carelessness or negligence,
was one to be passed upon by the jury under proper
instructions from the court, and we are not prepared to
say that there was not sufficient evidence upon which
to predicate such instructions.

The instructions that were given under this count
in the complaint presented the law of the case very
fairly to the jury.

The second count of the statement is predicated
upon sections 953 and 954, Revised Statutes, 1889.
They read as follows:

Sec. 953. "Every person shall so restrain his dis-
eased or distempered cattle, or such as are under his
care, that they may not go at large off his own premises
or the land to which they belong; and no person shall
drive any diseased or distempered cattle affected with
what is commonly known as Texas or Spanish fever,
or any other infectious disease, into or through this
state, or from one place therein to another, unless it be
to remove them from one piece of ground to another of
the same owner; and no railroad company or owners
of a steamboat, or any other company or person, shall

bring into or transport through this state, or from one part thereof to another, any Texas, Mexican, Cherokee or Indian cattle affected with what is commonly known as Texas or Spanish fever, or any other contagious disease, epidemic or pestilence;   *   *   *''

Sec. 954.  ''Any person or persons, railroad company or owner or owners of any steamboat, who shall offend against or violate any of the provisions of the next preceding section, shall be liable for all damages sustained on account of such. Texas or Spanish fever, or. other infectious disease, being communicated from any such diseased animal or cattle to any other animal or cattle in the neighborhood or along the line of such transportation, or removal of such diseased animal or cattle into or through this state, or from one part thereof to another; and the existence or presence of such Texas or Spanish fever, or other contagious or infectious disease, among the native cattle of this state, on the same range with or in the vicinity of any such Texas, Mexican, Cherokee or Indian cattle, or along the line or route over which they were removed or transported, shall be *prima facie* evidence that the same were affected with such disease at the time of being so removed or transported, and communicated it to such native cattle so affected therewith.''

It is claimed by defendants that the statute is unconstitutional and void as being an attempt to regulate commerce between the states; that the clause in the statute making the existence of Texas or Spanish fever, or other contagious or infectious diseases, among the native cattle along the line of railways along which Texas cattle may be transported, *prima facie* evidence that the cattle being so transported were diseased, include a condition or affection which is the normal or natural state of all Texas, Mexican, Cherokee or Indian cattle, and that, as the evidence shows that all such

cattle are alike affected, that they all have the parasite in their system which communicates a disease called Texas fever to native cattle (and if the language of the statute is broad enough to cover such a construction), then it is a regulation of commerce, under the decision in *Railroad v. Husen*, 95 U. S. 465.

It was held in that case that a statute which prohibited driving or conveying any Texas, Mexican, or Indian cattle into this state, between the first day of March and the first day of November in each year, was in conflict with the clause of the constitution that provides that congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes. But in the same opinion the right of a state to pass laws to prevent animals suffering with contagious or infectious diseases from being brought into such state and to exclude them therefrom is recognized. The court says: "It may also be admitted that the police powers of a state justifies the adoption of precautionary measures against social evils. Under it a state may legislate to prevent the spread of crime, or pauperism, or disturbance of the peace. It may exclude from its limits convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infections diseases; a right founded, as intimated in *The Passenger Cases*, 7 How. 283, by Mr. Justice GREER, in the sacred law of self-defense. *Vide* 3 Sawyer, 283. The same principle, it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the state; for example, animals having contagious or infectious diseases. All these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others. They are

self-defensive.'' See also *Minnesota v. Barber*, 136 U.
S. 313; *Kimmish v. Ball*, 129 U. S. 217.

In the case last cited, the court, in speaking of the
*Husen case,* says: ''The decision in that case rested
upon the ground that no discrimination was made by
the law of Missouri in the transportation forbidden
between sound cattle and diseased cattle; and this cir-
cumstance is prominently put forth in the opinion.''
Since the decision in the *Husen case* the statute has
been amended and section 953 provides that ''every
person shall so restrain his diseased or distempered
cattle, or such as are under his care, that they may not
go at large off his own premises or the land to which
they belong; and no person shall drive any diseased or
distempered cattle affected with what is commonly
known as Texas or Spanish fever, or any other infec-
tious disease, into or through this state, or from one
place therein to another, unless it be to remove them
from one piece of ground to another of the same owner,
and no railroad company or owners of a steamboat, or
any other company or person, shall bring into or trans-
port through this state, or from one part thereof to
another, any Texas, Mexican, Cherokee or Indian cattle
affected with what is commonly known as Texas or
Spanish fever, or any other contagious disease, epidemic
or pestilence.''

In *Gilman v. Philadelphia*, 3 Wall. 713, it is held
that, ''under quarantine laws, a vessel registered or
enrolled and licensed, may be stopped before entering
her port of destination,   *   *   *   and a bale of goods
upon which the duties have or have not been paid
laden with infection, may be seized under 'health
laws,' and, if it can not be purged of its poison, may be
committed to the flames.'' (p. 730.)

The purpose of the statute is not to interfere with
the commerce between the states, but is to exclude

from the state and to prohibit the importation thereto of cattle having contagious or infectious diseases, and therefore exclusively for the protection of the property of the citizens of this state against the acts of such persons as use their property in such a way as is dangerous and detrimental to the interest of others. In speaking of the Kansas statute, enacted for the same purpose, in *Railroad v. Finley, supra,* it is said: "If this law is not constitutional and within the police power of the state, then the state is absolutely powerless to protect the property of its citizens. If this and similar statutes are in conflict with the constitution of the United States, the state is wholly disarmed and defenseless to exclude property from the state that is dangerous and injurious to the property of its citizens."

But it is argued that, as all Texas cattle, though not diseased, have the means, power or quality, by reason of their nativity and their usual and normal condition, to communicate disease to native cattle, then it must include all cattle coming from the south and amounts to an absolute inhibition of their shipment into or through this state. Grant it that such is the effect, yet it seems clear that if they are diseased, or infected with a parasite which they communicate to and which destroys native cattle, the state has the same right, as a police regulation for the protection of the property of her citizens, to prohibit their importation into the state as it would have to prohibit the importation of persons affected or infected with some contagious and deadly disease.

A part of a statute may be unconstitutional and another part valid, even though the incongruous provisions be contained in the same section, or it may be unconstitutional with respect to its effect upon certain subjects or things embraced within its scope and

application, and constitutional as to others.   If when the unconstitutional portion is stricken out, that which remains is complete in itself and capable of being enforced according to the legislative intent, independent of that which is rejected, to the extent of the conflict and repugnancy it may not be enforced, while it is otherwise as to the provisions not repugnant to the constitution.

Thus, that part of the statute which prohibits any railroad company or owner of a steamboat or any other company or person from bringing into this state, for the purpose of transportation through the same, any of the diseased cattle of the kind and character mentioned in the act, may be held unconstitutional, and that part which prohibits the bringing into the state, or the driving on foot of such cattle from one part of it to another may be upheld as a police regulation.   Shipping such cattle by railroad or steamboat is attended with but little, if any, danger, as it is only when they come in contact with the ground with their feet, or by their droppings on the ground that they are capable of imparting the fever to native cattle.   While the state has no power to prohibit the transportation of articles of commerce through it by common carriers, railroads and steamboats, it has the right to restrict the manner and mode of taking animals infected with parasites, by which they communicate disease to native cattle, and to confine that mode to railroads and steamboats, if necessary, in order to prevent the spread of disease and contagion whch results in the destruction of the property of her citizens.

"To the extent of the [such] collision and repugnancy, the law of the state must yield, and to that extent, and no further, it is rendered by such repugnancy, inoperative and void."   *Commonwealth v. Kimball*, 24 Pick. 359.   It was held in *Donnersberger v.*

*Prendergast,* 128 Ill. 229, that "because a portion of a statute is unconstitutional, it does not follow that the court may declare its other provisions void, if they are separable, and the valid portions are capable of enforcement, independently of such void provision, unless it shall appear that all of the provisions of the act so depend on each other, operating together for the same purpose, or are otherwise so connected together in meaning, that it can not be presumed the legislature would have passed the one without the other." "A legislative act may be entirely valid as to some classes of cases, and clearly void as to others." Cooley's Const. Limit. [6 Ed.], 213. Thus it has been held that the law prohibiting the sale of liquors may be void as to imported liquors and valid as to all other. *State v. Amery,* 12 R. I. 64; *Tiernan v. Rinker,* 102 U. S. 123.

The power to prevent the importation of diseased or infected cattle into the state, and the power to prevent the transportation of such cattle through the state over the great thoroughfares, railroads, or by river, rest upon very different principles; the one, as has been seen, may be regulated or prohibited by the state in the exercise of its police power, while the other is a plain regulation of interstate commerce, a regulation extending to prohibition. Cattle thus transported are articles of commerce, and whatever may be the power of the state over commerce that is altogether confined within its borders, it can not prohibit or regulate that which is interstate. Texas cattle, as a general thing, while having that peculiarity, not possessed by native cattle, of transmitting or communicating to them, through a microbe or parasite carried in their bodies, the Texas fever, are wholesome food and extensively used for that purpose, and are to be found for sale as beef in many of the markets of the different states.

The burdens imposed upon railroads for transporting them through the state are onerous because of their liability to escape from the cars, and in that way, and otherwise, communicate disease to native cattle, and, to prevent such occurrence the state, as a police regulation, would clearly have the right to prescribe the kind of cars in which they shall be transported, and such precautionary measures as may be reasonably necessary for that purpose. The transportation of property from one state to another is clearly a branch of interstate commerce, and the statute is unquestionably a plain interference with such transportation—in fact, an absolute inhibition against it. The effect of the statute is to obstruct interstate commerce, and to discriminate between the property of one state and that of citizens of other states, and in so far as it prohibits the transportation of Texas, Mexican, Cherokee and Indian cattle through the state, by railroads and steamboats, conflicts with that provision of the constitution that provides that "Congress shall have the power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." *Leisy v. Hardin*, 135 U. S. 132; *Minnesota v. Barber*, 136 U. S. 313; *Crutcher v. Commonwealth of Kentucky*, 11 Sup. Ct. Rep. 854.

The first clause of section 953, which provides that "every person shall so restrain his diseased or distempered cattle, or such as are under his care, that they may not go at large off his own premises or the land to which they belong" has no application whatever to a case like the one in hand. It is evident, from a casual reading of it, that it only has application to cattle that are kept or herded upon some particular tract of land or premises.

The mischief intended to be prevented by the act was the importation into this state of Texas, Mexican,

Cherokee and Indian cattle, by which a disease, commonly called and known as Texas fever, is communicated to domestic cattle, and, although the statute mentioned cattle affected or infected with Texas or Spanish fever, the evident intention of the legislature was to include such cattle as were infected with microbes or parasites, by which said fever is communicated. The act is entitled "An act to amend section 4358 of article two of chapter eighty-seven of the Revised Statutes of Missouri, entitled, 'Of the restraint of diseased and Texas cattle.'" Laws, 1881, page 40. Mr. Kent, in his Commentaries, volume 1, *page 461, says: In the exposition of statutes * * * the intention of the lawgiver will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. "When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the objects and the remedy in view; and the intention is to be taken or presumed, according to what is consonant to reason and good discretion." We must, therefore, hold that the statute is broad enough, when the object of the legislature is taken into consideration, to embrace cattle infected with microbes or parasites by which Texas fever is communicated to domestic cattle.

The judgment as to the first count is affirmed. As to the second count, the judgment is reversed. All concur. BARCLAY, J., concurs in the result.